UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

ENRIQUE RIVERA,                      :

                    Plaintiff,       :    13 Civ. 7150 (PGG)(HBP)

    -against-                        :    REPORT AND
                                          RECOMMENDATION
CAROLYN W. COLVIN, acting            :
Commissioner of Social Security,
                                     :
                    Defendant.
                                     :
----------------------------------X

          PITMAN, United States Magistrate Judge:

          TO THE HONORABLE PAUL G. GARDEPHE, United States

District Judge,

I.  Introduction

          Plaintiff, Enrique Rivera, brings this action pursuant

to Section 205(g) of the Social Security Act (the "Act"), 42

U.S.C. § 405(g), seeking judicial review of a final decision of

the Commissioner of Social Security ("Commissioner") denying his

application for supplemental security income benefits ("SSI").

Plaintiff has moved for judgment on the pleadings under Rule

12(c) of the Federal Rules of Civil Procedure (Notice of Motion,

dated April 25, 2014 (Docket Item 10)).  The Commissioner has

filed a cross-motion also seeking judgment on the pleadings

(Notice of Motion, dated June 27, 2014 (Docket Item 14)).

For the reasons set forth below, I respectfully recommend that plaintiff's motion for judgment on the pleadings be granted to the extent of remanding this matter for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g) and that the Commissioner's motion for judgment on the pleadings be denied.

II.  <u>Facts</u>

A.   Procedural
     <u>Background</u>

Plaintiff filed an application for SSI on May 16, 2011,[1] alleging that he had been disabled since February 1, 2007 (Tr.[2] 102-10).  The SSA denied plaintiff's application, finding

---

[1]Plaintiff was given a protective filing date of April 25, 2011 (Tr. 153).  A claimant is issued a protective filing date when he files a written statement with the Social Security Administration ("SSA") that indicates an intent to file a claim for benefits.  20 C.F.R. § 416.340.  "If a claimant is given a protective filing date that is earlier than the application date, the availability of social security benefits is calculated from the earlier protective filing date." <u>Elliott v. Colvin</u>, 13 Civ. 2673 (MKB), 2014 WL 4793452 at *1 n.1 (E.D.N.Y. Sept. 24, 2014), <u>citing</u> <u>Roma v. Astrue</u>, No. 07-CV-1057, 2010 WL 3418165 at *1 n.1 (D. Conn. Mar. 12, 2010) ("[A]ny post-entitlement determinations involving the application filing date would use the protective filing date.").

[2]"Tr." refers to the administrative record that the Commissioner filed with her answer, pursuant to 42 U.S.C. §
(continued...)

2

that he was not disabled (Tr. 71).  Plaintiff timely requested
and was granted a hearing before an Administrative Law Judge
("ALJ") (see Tr. 64).  ALJ Michael Stacchini conducted a hearing
on June 19, 2012 (Tr. 28-52).  In a decision dated July 24, 2012,
ALJ Stacchini determined that plaintiff was not disabled within
the meaning of the Act (Tr. 16-23).  The ALJ's decision became
the final decision of the Commissioner on August 14, 2013 when
the Appeals Council denied plaintiff's request for review (Tr. 1-
4).

        Plaintiff commenced this action seeking review of the
Commissioner's decision on October 9, 2013 (Complaint (Docket
Item 2)).  On April 25, 2014, plaintiff moved for judgment on the
pleadings (Docket Item 10), and on June 27, 2014 the Commissioner
cross-moved for judgment on the pleadings (Docket Item 14).

    B.   Plaintiff's
         Social Background

        Plaintiff was born December 6, 1964 and was forty-six
years old when he applied for SSI (see Tr. 153).  He holds a
General Education Diploma and speaks English (Tr. 156, 158).  At
the time of the hearing, plaintiff lived at a residential facil-

---

        [2](...continued)
405(g) (see Notice of Filing of Administrative Record, dated
December 5, 2013 (Docket Item 8)).

ity, Starhill/Palladia,[3] as mandated by the Brooklyn Mental
Health Court,[4] where he received mental health treatment (Tr. 36-
37, 187).  At that time, plaintiff had lived in the facility for
approximately thirty months (Tr. 38).  Plaintiff had not had full
time employment since 2006 (Tr. 39), although he did some part
time work as a janitor for FEGS[5] about a year before the hearing
(Tr. 38).

---

[3]Starhill/Palladia is a residential drug treatment facility.
"Starhill's multidisciplinary staff also assists clients in
developing solutions to challenges beyond substance abuse -- such
as co-occurring disorders, pregnancy, legal and/or medical
issues, and vocational direction and skills."  Starhill|Palladia,
Starhill, http://www.palladiainc.org/our-services/behavioral-
health/starhill/ (last visited Dec. 8, 2014).

[4]The Brooklyn Mental Health Court "is a specialized court
part that seeks to craft a meaningful response to the problems
posed by defendants with mental illness in the criminal justice
system."  Center for Court Innovation, Brooklyn Mental Health
Court, http://www.courtinnovation.org/project/brooklyn-mental-
health-court (last visited Dec. 8, 2014).

[5]Federal Employment and Guidance Service ("FEGS") WeCare is
a New York City program that "helps [public] assistance appli-
cants and recipients with complex clinical barriers to employ-
ment, including medical, mental health, and substance abuse
conditions, to obtain employment or federal disability benefits."
FEGS: WeCare, FEGS Health & Human Servs., http://www.fegs.org/
what-we-do/employment-workforce/jobseekers/wecare (last visited
Oct. 29, 2014).

1.   Function Reports
     <u>Completed by Ms. Gonzalez</u>

Waleska Gonzalez, a friend of plaintiff's mother, completed a Function Report for plaintiff on May 31, 2011 (Tr. 164-86).  In that report, Ms. Gonzalez wrote that plaintiff stated that without medication he would become violent and would not dress, bathe, shave or eat (Tr. 166-67).  Ms. Gonzalez wrote that staff from plaintiff's living facility reminded him to perform all his daily activities (Tr. 167), and that while he did some chores, he did them under the supervision of the facility's staff (Tr. 166).  She also wrote that plaintiff stated that he did not do house or yard work because "when something d[id]n't come out right [he would] get upset and break stuff" (Tr. 168).

Ms. Gonzalez also completed a Function Report on May 31, 2011 based on information from plaintiff's mother, who does not speak English and requested Ms. Gonzalez's assistance in completing the form (Tr. 186).  Ms. Gonzalez again wrote that plaintiff did chores under the supervision of people from the home (Tr. 178), and that the staff at the home had to remind plaintiff to bathe and shave (Tr. 179).  Ms. Gonzalez reported that plaintiff required supervision to go out to attend his outpatient appointments, and that he could not go out alone because he would get confused and forget where he was (Tr. 181).

She also reported that plaintiff would get angry easily and had trouble getting along with people (Tr. 183).

    2.   Function Report
          Completed by Plaintiff's
          <u>Mental Health Counselor</u>

Plaintiff's mental health counselor completed a Function Report on June 15, 2011 (Tr. 187-99).  In the report, the counselor stated that plaintiff attended six group therapy sessions daily (Tr. 188).  He wrote that plaintiff helped clean the kitchen (Tr. 190) but did not prepare his own meals (Tr. 189).  The counselor wrote that plaintiff was capable of taking public transportation but did not like to be "closed in" and usually walked instead (Tr. 190).  The counselor reported that plaintiff shopped for clothes for two hours every six months but did no other shopping (Tr. 191).  He reported that plaintiff's hobbies included reading and painting (Tr. 191), and that plaintiff walked for one hour each day (Tr. 192).

The counselor also wrote that plaintiff was not able to sleep without medication, and that even with medication plaintiff had difficulties (Tr. 188).  The counselor wrote that plaintiff had memory issues and had to be reminded to take his medication (Tr. 189), and though he was able to follow instructions, he needed the instructions to be written down because he was unable

to remember them (Tr. 195).  The counselor reported that plain-
tiff did not socialize (Tr. 192) and had anger and anxiety issues
(Tr. 195).  These anxiety issues included weekly anxiety attacks
during which plaintiff experienced fear, chest pain and diffi-
culty breathing; plaintiff coped with these episodes by taking
long walks away from people (Tr. 195).

> C.   Plaintiff's
>      Medical Background[6]

Plaintiff has a history of suicide attempts and one
homicide attempt (Tr. 239, 248).  Plaintiff received psychiatric
treatment in 1988 (Tr. 230-37) and went to the Emergency Room in
2004 after attempting suicide (Tr. 238-43).  Plaintiff also
underwent psychiatric treatment in 2010, 2011 and 2012.

> 1.   Treating Sources

>      a.   Nurse Practitioners

Plaintiff was seen consistently by nurse practitioners
("NP") starting in 2010, and treatment notes from those nurses
indicate that plaintiff suffered from various symptoms of depres-

---

[6]I recite only those facts relevant to my review.  The
administrative record more fully sets out plaintiff's medical
history (Docket Item 11).

sion and anxiety.  In March 2010, plaintiff was described as
"present[ing] as though [he] has given up" (Tr. 292-93), and in
April 2010, he expressed concern that he would react violently to
the staff at his group home (Tr. 294).  In May 2010, plaintiff
had a "flat, angry affect, no eye contact, [and was] monosyl-
labic" (Tr. 295).  In June 2010 he continued to have a flat and
angry affect, "although appropriate in session," and at that time
he reported that he was taking long walks as a coping mechanism
(Tr. 296).  His anxiety and agitation increased in July 2010 when
he was no longer able to take long walks, and the nurse attempted
to get his permission to exercise reinstated (Tr. 297).

        In August 2010, treatment notes state that plaintiff
was agitated and could not sit still (Tr. 298-99).  In September
2010 he was anxious and frustrated because he felt his job search
was being held up intentionally by his vocational therapist, but
he denied suicidal or homicidal ideation (Tr. 300-01).  In
October 2010 he was still frustrated about his delayed job
search, and he reported that he was waking up twice during the
night with tightness in his chest (Tr. 302-03).  In November
2010, he had trouble sleeping and was agitated, and the nurse
practitioner indicated that he had a "low tolerance level with
small triggers" (Tr. 306-09).  Plaintiff denied other depressive
symptoms at that time, and later that month he reported sleeping

well and feeling good (Tr. 306-09).  In December 2010, the nurse practitioner indicated that plaintiff's appointment had been scheduled because plaintiff was looking for a job, and that he was sleeping well but feeling sad (Tr. 310-11).  In March 2011 he reported sleeping well and feeling good (Tr. 312-13).

A Psychiatric Questionnaire was completed by Roberta Kelly, a family nurse practitioner of Project Samaritan[7] on June 6, 2011, and she wrote that plaintiff suffered from bipolar disorder, depression, anxiety disorder and hyperlipidemia[8] and that these disorders were chronic and permanent (Tr. 244-47).  A second Psychiatric Questionnaire, completed by nurse practitioner Jieun Jung and undated, reported that plaintiff lacked normal ability to get along with people, and that plaintiff was mildly depressed and anxious (Tr. 249-52).  NP Jung wrote that plaintiff would not be able to hold a job beyond a few months because of arguments with co-workers and that he would be limited in follow-ing detailed instructions (Tr. 250-51).  NP Jung wrote that

---

[7]Project Samaritan is "a person-centered, comprehensive, health-and-wellness organization serving approximately 13,000 New Yorkers annually with a particular focus on care for underserved populations experiencing co-occurring morbidities who face barriers to accessing primary and mental healthcare."  HELP/PSI: Building Hope and Empowering Change, http://www.projectsamaritan .org/ (last visited Dec. 8, 2014).

[8]"Hyperlipidemia" is "a general term for elevated concentra-tions of any or all of the lipids in the plasma."  Dorland's Illustrated Medical Dictionary, at 794 (27th ed. 1998).

9

plaintiff's impulse control was good, his concentration was intact and that his memory was "forgettable but age appropriate" (Tr. 248, 250). She also indicated that plaintiff had no limitations with respect to the activities of daily living (Tr. 250).

Treatment notes from June 8, 2011 describe plaintiff as anxious and worried about his future, withdrawn with moderate eye contact, and report that, at that time, plaintiff was working as a janitor at FEGS for five hours per day, five to six days per week, without any trouble (Tr. 256-58). Treatment notes from November 2011 indicate plaintiff was having difficulty sleeping again (Tr. 315-16). Treatment notes from January 2012 state that plaintiff was "not related well with short and simple answers," but that he was "[s]till good with his girlfriend" (Tr. 317-18).

b.  Treating Physicians

Treatment notes from plaintiff's visits to Dr. Andrew Chen, dated January 20, 2010, indicate that plaintiff displayed isolated behavior, depression, sad mood and unprovoked anger (Tr. 288-89). A week later, Dr. Chen's notes reflect that plaintiff had occasional difficulty sleeping, but otherwise had no complaints (Tr. 290-91). Dr. Chen's notes from October 2010 reflect that plaintiff denied any depressive symptoms but had

trouble sleeping and was experiencing episodes of anxiety (Tr. 304-05).

Treatment notes from Dr. Andrew Rosendahl, dated March 2012, reflect that plaintiff had an irritable mood and difficulty sleeping (Tr. 319-20).  The next month plaintiff was agitated (Tr. 321), and in May 2012, Dr. Rosendahl wrote that plaintiff was stable with residual irritability and erratic sleep (Tr. 322-23).  He also wrote that plaintiff exhibited "sig[nificant(?)] personality pathology" and was "quite entitled [sic]" (Tr. 322-23).  In June 2012, Dr. Rosendahl's list of plaintiff's diagnoses included post traumatic stress disorder, mood disorder, intermittent explosive disorder, anxiety disorder and antisocial personality disorder (Tr. 326).  Dr. Rosendahl prescribed that plaintiff remain in close psychiatric observation and treatment to target depression, mood lability, impulsivity and rage episodes, and described plaintiff as stable with persistent anger and irritability (Tr. 325-27).

2.  Consulting Physicians

On June 22, 2011, Dr. Edward Hoffman, an SSA consulting psychologist, examined plaintiff and completed a Psychiatric Evaluation (Tr. 259-62).  Plaintiff arrived at the appointment by taking the subway by himself, and at the time, he was attending

11

job training through FEGS (Tr. 259). Plaintiff reported that he saw a psychiatrist monthly and a therapist weekly (Tr. 259). Plaintiff's medication included Zoloft, Seroquel, Remeron, Abilify and BuSpar (Tr. 259). Plaintiff reported poor sleep, frequent nightmares, excessive appetite and depression, but he denied suicidal ideation, homicidal ideation and hallucinations (Tr. 259).

Dr. Hoffman wrote that plaintiff had a "somewhat constricted range of affect" and that his mood was anxious but stable (Tr. 260). Dr. Hoffman also found that plaintiff's attention and concentration were "not adequate, as measured by arithmetic questions and questions of general knowledge" and that plaintiff had a borderline range of intelligence with fair insight and judgment (Tr. 260). Dr. Hoffman found plaintiff's socialization skills were impaired, but that plaintiff could maintain a schedule, relate adequately to others in "structured situations," and had "adequate adaptive functioning" (Tr. 261). He wrote that plaintiff could not manage funds independently and that his prognosis was "guarded" (Tr. 262). Dr. Hoffman recom-mended that plaintiff obtain vocational counseling and continue to receive "intensive outpatient mental health treatment" (Tr. 261).

Dr. T. Harding, an SSA consulting psychologist, completed a Psychiatric Review Technique for plaintiff on August 3, 2011 (Tr. 263-76).  His report does not appear to be based on an examination of plaintiff.  Dr. Harding found that plaintiff suffered from affective disorders, organic mental disorders, anxiety related disorders and substance addiction disorders and would require a residual functional capacity ("RFC") assessment (Tr. 263).

Dr. Harding also completed a Mental Residual Functional Capacity Assessment of plaintiff (Tr. 277-80).  This assessment does not appear to be based on an examination of plaintiff.  Dr. Harding found that plaintiff was moderately limited in his ability to understand, remember and carry out detailed instructions and in his ability to maintain concentration for extended periods (Tr. 277).  Dr. Harding also found plaintiff to be moderately limited in his ability to complete a workweek without interruptions from psychologically based symptoms, his ability to get along with co-workers, his ability to respond appropriately to supervisors and changes in the work setting and his ability to maintain socially appropriate behavior (Tr. 278).  Dr. Harding found that plaintiff retained the RFC for unskilled work in a setting that does not emphasize social interaction (Tr. 279).

D.   Proceedings
     Before the ALJ

     1.   Plaintiff's
          Testimony

Plaintiff testified that he arrived at the hearing by
taking the subway at 5:00 A.M. because it is empty at that time
(Tr. 34).  He testified that he often went walking, but that his
walking was limited at that time because he had injured his foot
and required the assistance of a cane (Tr. 34).  He testified
that he walked by himself from one side of the Bronx to the other
(Tr. 35).

Plaintiff testified that he resided in a court-mandated
substance abuse and mental health treatment facility (Tr. 36-37).
He testified that at this facility, his meals were prepared for
him (Tr. 36), but he did his own laundry in the communal laundry
area (Tr. 37).  Plaintiff testified that he did not get along
well with the people with whom he lived (Tr. 38), and he had been
in three fights at his living facility (Tr. 46-47).

Plaintiff testified that he had worked in a janitorial
capacity, through a FEGS program, but that the job was "too
closed in" (Tr. 39).  Years earlier he had had a job working on a
bridge, but the heights upset him (Tr. 39).  Plaintiff testified
that within the past five years he had gone to FEGS to see if

14

they would help him find a job, but they had not been helpful
(Tr. 42-43).

Plaintiff testified that he became anxious in closed
spaces and that he was forgetful (Tr. 43).  He testified that his
hobbies included reading fantasy books (Tr. 44), and he called
his mother every day (Tr. 37).  Plaintiff testified that he had
graduated from Brooklyn Mental Health Court (Tr. 37), and that he
was looking for new housing using Google (Tr. 46).

                    2.   Vocational
                         Expert Testimony

The ALJ did not question the vocational expert about
plaintiff's janitorial job because he found that it was not
substantial gainful activity (Tr. 49).  In his first question to
the vocational expert, the ALJ described a hypothetical individ-
ual who had no exertional limitations but did have the following
restrictions:  could not be exposed to heights or dangerous
machinery, could only perform simple repetitive tasks, could be
off-task 5% of the day outside of regularly scheduled breaks,
could have one absence per month and could interact with co-
workers and supervisors only occasionally (Tr. 49-50).  The
vocational expert testified that such an individual could perform
the work of laundry bagger, cafeteria attendant or addresser (Tr.

15

50).  In his second question to the vocational expert, the ALJ described a hypothetical individual with the same limitations as the first hypothetical individual, but with the additional limitation that he could be off-task 20% of the day and absent two days per month (Tr. 50).  The vocational expert testified that such individual would not be able to perform any work that existed in the national economy (Tr. 50-51).

III.  <u>Analysis</u>

    A.  Applicable
       <u>Legal Principles</u>

      1.  <u>Standard of Review</u>

      The Court may set aside the final decision of the Commissioner only if it is not supported by substantial evidence or if it is based upon an erroneous legal standard.  42 U.S.C. § 405(g); <u>Selian v. Astrue</u>, 708 F.3d 409, 417 (2d Cir. 2013) (<u>per curiam</u>); <u>Talavera v. Astrue</u>, 697 F.3d 145, 151 (2d Cir. 2012); <u>Burgess v. Astrue</u>, 537 F.3d 117, 127 (2d Cir. 2008).

      The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does it determine whether the Commissioner's conclusions were supported by substantial evidence.  <u>Tejada v. Apfel</u>, 167 F.3d 770, 773 (2d

16

Cir. 1999); Johnson v. Bowen, 817 F.2d 983, 985 (2d Cir. 1987).
"Even if the Commissioner's decision is supported by substantial
evidence, legal error alone can be enough to overturn the ALJ's
decision," Ellington v. Astrue, 641 F. Supp. 2d 322, 328
(S.D.N.Y. 2009) (Marrero, D.J.); accord Johnson v. Bowen, supra,
817 F.2d at 986, but "where application of the correct legal
principles to the record could lead to only one conclusion, there
is no need to require agency reconsideration," Johnson v. Bowen,
supra, 817 F.2d at 986.

          "'Substantial evidence' is 'more than a mere scintilla.
It means such relevant evidence as a reasonable mind might accept
as adequate to support a conclusion.'" Talavera v. Astrue,
supra, 697 F.3d at 151, quoting Richardson v. Perales, 402 U.S.
389, 401 (1971).  Consequently, "[e]ven where the administrative
record may also adequately support contrary findings on particu-
lar issues, the ALJ's factual findings 'must be given conclusive
effect' so long as they are supported by substantial evidence."
Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam),
quoting Schauer v. Schweiker, 675 F.2d 55, 57 (2d Cir. 1982).
Thus, "[i]n determining whether the agency's findings were
supported by substantial evidence, 'the reviewing court is
required to examine the entire record, including contradictory
evidence and evidence from which conflicting inferences can be

17

drawn.'"  Selian v. Astrue, supra, 708 F.3d at 417, quoting

Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (per

curiam).

   2. Determination
    of Disability

  A claimant is entitled to SSI benefits if he can

establish an inability to "engage in any substantial gainful

activity by reason of any medically determinable physical or

mental impairment . . . which has lasted or can be expected to

last for a continuous period of not less than twelve months."

42 U.S.C. § 1382c(a)(3)(A); see also Barnhart v. Walton, 535 U.S.

212, 217-22 (2002) (both impairment and inability to work must

last twelve months).[9]  The impairment must be demonstrated by

"medically acceptable clinical and laboratory diagnostic tech-

niques," 42 U.S.C. § 1382c(a)(3)(D), and it must be "of such

severity" that the claimant cannot perform his previous work and

"cannot, considering [the claimant's] age, education, and work

experience, engage in any other kind of substantial gainful work

---

  [9]The standards that must be met to receive SSI benefits
under Title XVI of the Act are the same as the standards that
must be met in order to receive disability insurance benefits
under Title II of the Act.  Barnhart v. Thomas, 540 U.S. 20, 24
(2003).  Accordingly, cases addressing the latter are equally
applicable to cases involving the former.

which exists in the national economy."  42 U.S.C. §
1382c(a)(3)(B).  Whether such work is actually available in the
area where the claimant resides is immaterial.  42 U.S.C. §
1382c(a)(3)(B).

In making the disability determination, the Commis-
sioner must consider:  "(1) the objective medical facts; (2)
diagnoses or medical opinions based on such facts; (3) subjective
evidence of pain or disability testified to by the claimant or
others; and (4) the claimant's educational background, age, and
work experience."  Brown v. Apfel, supra, 174 F.3d at 62; DiPalma
v. Colvin, 951 F. Supp. 2d 555, 565 (S.D.N.Y. 2013) (Peck, M.J.).

The Commissioner must follow the five-step process
required by the relevant regulations.  20 C.F.R. §
416.920(a)(4)(i)-(v).  The first step is a determination of
whether the claimant is engaged in substantial gainful activity.
20 C.F.R. § 416.920(a)(4)(i).  If he is not, the second step
requires determining whether the claimant has a "severe medically
determinable physical or mental impairment."  20 C.F.R. §
416.920(a)(4)(ii).  If he does, the inquiry at the third step is
whether any of these impairments meet one of the listings in
Appendix 1 of the regulations.  20 C.F.R. § 416.920(a)(4)(iii).
If the answer to this inquiry is affirmative, the claimant is
disabled.  20 C.F.R. § 416.920(a)(4)(iii).

19

If the claimant does not meet any of the listings in Appendix 1, step four requires an assessment of the claimant's RFC and whether the claimant can still perform his past relevant work given his RFC.  20 C.F.R. § 416.920(a)(4)(iv); see Barnhart v. Thomas, supra, 540 U.S. at 24-25.  If he cannot, then the fifth step requires assessment of whether, given claimant's RFC, he can make an adjustment to other work.  20 C.F.R. § 416.920(a)(4)(v).  If he cannot, he will be found disabled.  20 C.F.R. § 416.920(a)(4)(v); see Selian v. Astrue, supra, 708 F.3d at 417-18; Talavera v. Astrue, supra, 697 F.3d at 151.

RFC is defined in the applicable regulations as "the most [the claimant] can still do despite [his] limitations." 20 C.F.R. § 416.945(a)(1).  To determine RFC, the ALJ "identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b),(c), and (d) of 20 [C.F.R. §§] 404.1545 and 416.945." Cichocki v. Astrue, 729 F.3d 172, 176 (2d Cir. 2013) (per curiam), quoting SSR 96-8p, 1996 WL 374184 at *1 (July 2, 1996). The results of this assessment determine the claimant's ability to perform the exertional demands of sustained work and may be categorized as sedentary, light, medium, heavy or very heavy.  20 C.F.R. § 416.967; see Rodriguez v. Apfel, 96 Civ. 8330 (JGK),

1998 WL 150981 at *7 n.7 (S.D.N.Y. Mar. 31, 1998) (Koeltl, D.J.).
This ability may then be found to be further limited by non-
exertional factors that restrict the claimant's ability to work.
See Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004), amended
in part on other grounds on reh'g, 416 F.3d 101 (2d Cir. 2005);
Bapp v. Bowen, 802 F.2d 601, 605-06 (2d Cir. 1986).

        The claimant bears the initial burden of proving
disability with respect to the first four steps. Selian v.
Astrue, supra, 708 F.3d at 418; Burgess v. Astrue, supra, 537
F.3d at 128.  Once the claimant has satisfied this burden, the
burden shifts to the Commissioner to prove the final step -- that
the claimant's RFC allows the claimant to perform some work other
than his past work. Selian v. Astrue, supra, 708 F.3d at 418;
Butts v. Barnhart, supra, 388 F.3d at 383.

        In some cases, the Commissioner can rely exclusively on
the Medical-Vocational Guidelines ("the Grid") contained in 20
C.F.R. Part 404, Subpart P, Appendix 2 when making the determina-
tion at the fifth step. Gray v. Chater, 903 F. Supp. 293, 297-98
(N.D.N.Y. 1995).  "The Grid takes into account the claimant's RFC
in conjunction with the claimant's age, education and work
experience.  Based on these factors, the Grid indicates whether
the claimant can engage in any other substantial gainful work
which exists in the national economy." Gray v. Chater, supra,

903 F. Supp. at 298; accord Butts v. Barnhart, supra, 388 F.3d at
383.

The Grid may not be relied upon exclusively in cases
where the claimant has nonexertional limitations that signifi-
cantly restrict his ability to work.  Butts v. Barnhart, supra,
388 F.3d at 383; Bapp v. Bowen, supra, 802 F.2d at 605-06.  When
a claimant suffers from a nonexertional limitation such that he
is "unable to perform the full range of employment indicated by
the [Grid]," Bapp v. Bowen, supra, 802 F.2d at 603, or the Grid
fails "to describe the full extent of a claimant's physical
limitations," Butts v. Barnhart, supra, 388 F.3d at 383, the
Commissioner must introduce the testimony of a vocational expert
in order to prove "that jobs exist in the economy which claimant
can obtain and perform."  Butts v. Barnhart, supra, 388 F.3d at
384 (internal quotation marks and citation omitted); see also
Heckler v. Campbell, 461 U.S. 458, 462 n.5 (1983) ("If an indi-
vidual's capabilities are not described accurately by a rule, the
regulations make clear that the individual's particular limita-
tions must be considered.").

B.    <u>The ALJ's Decision</u>

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since April 25, 2011 (Tr. 18).

At step two, the ALJ found that plaintiff had several severe impairments, including bipolar disorder, anxiety, depression and a cognitive disorder "not otherwise specified" (Tr. 18). The ALJ found that plaintiff also had two non-severe impairments -- polysubstance abuse, which was in remission, and hyperlipidemia (Tr. 18).

At step three, the ALJ found that plaintiff did not have impairments that met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 18). The ALJ found that plaintiff did not meet the Paragraph B Criteria for Mental Disorders because plaintiff had only moderate restrictions in activities of daily living, moderate difficulties in maintaining social functioning and concentration, persistence or pace, and no episodes of decompensation for an extended duration (Tr. 19).  The ALJ noted that while there were one or two episodes of decompensation in plaintiff's history, his last psychiatric hospitalization occurred in 2004 (Tr. 19).  The ALJ stated that plaintiff had no recent episodes of decompensation

23

and that plaintiff was often in public, walked when he could, had
consistently tested normal for concentration and was capable of
performing his own activities of daily living (Tr. 19).  The ALJ
found that the plaintiff did not meet the Paragraph C Criteria[10]
for Mental Disorders because he had no recent episodes of decompen-
sation, had no residual disease process that would preclude
increased mental demands, and he was able to function outside a
highly supportive living environment (Tr. 19).

> At step four, the ALJ found the plaintiff's RFC to
encompass the

> full range of work at all exertional levels but with
> the following non-exertional limitations:  avoid all
> exposure to hazardous machinery and unprotected
> heights; permitted to be off tasks 5% off task [sic],
> in addition to regularly scheduled breaks; one excused
> absence per month; limited to simple, routine and
> repetitive tasks; occasional interaction with the
> general public; and occasional interaction with co-
> workers, including supervisors

(Tr. 19).

> The ALJ found that plaintiff was "credible, but not to
the extent alleged [sic]" (Tr. 21).  The ALJ found that although
the plaintiff claimed to experience anxiety around people, he
lived in a group setting, did his laundry in a group area, went

---

[10]The Paragraph C Criteria describe functional limitations
of an individual that, if present, direct a finding of disabil-
ity.  20 C.F.R. pt. 404, subpt. P, app. 1, § 12.04.

for long walks and took public transportation (Tr. 21).  The ALJ
also noted that the plaintiff had had romantic relationships and
could perform his own activities of daily living (Tr. 21).  The
ALJ further noted that plaintiff stopped working because his last
job was temporary, not because he had any impairments, and that
in late 2010 plaintiff searched for work (Tr. 21).  The ALJ
stated that plaintiff's mental status examinations had "been
essentially normal" for the past two years and that plaintiff had
been diagnosed recently as stable and denied any mood symptoms
aside from irritability (Tr. 21).

          The ALJ accorded "great weight" to the opinions of the
psychological consultative examiner and the opinions set forth in
the Psychiatric Review Technique and Mental Residual Function
Capacity Assessment "since those assessments [conclude] that the
claimant can perform unskilled work [sic], despite an array of
moderate mental limitations" (Tr. 21).  The ALJ accorded NP
Jung's opinions "little weight" because they were inconsistent
with activities of daily living that plaintiff was able to
perform and with the medical records, and because NP Jung is not
a medically acceptable source within the meaning of 20 C.F.R. §
416.913(d) (Tr. 21).

The ALJ found that plaintiff could not perform his past relevant work as a janitor because it was "too physically and mentally demanding" (Tr. 21).[11]

At step five, the ALJ found that there are jobs that plaintiff could perform that exist in the national economy in significant numbers (Tr. 22). The ALJ found that while plaintiff could perform work at all exertional levels, plaintiff suffered from nonexertional limitations, and, therefore, the ALJ solicited testimony from a vocational expert (Tr. 22). The vocational expert testified that an individual with plaintiff's RFC, age, education and work experience would be able to perform the work of a laundry bagger, cafeteria attendant or addresser, and the ALJ found, based on the vocational expert's testimony, that plaintiff could make a successful adjustment to other work (Tr. 22). The ALJ therefore found plaintiff not disabled under the framework of section 204.00 of the Grid (Tr. 22).[12]

---

[11]It is not clear what work the ALJ is referring to here. Past relevant work must be work that was a substantial gainful activity. 20 C.F.R. § 416.960(b)(1). The ALJ stated in his decision that "[a]t no time relevant to this decision has the claimant engaged in substantial gainful activity" (Tr. 18).

[12]The ALJ does not explain this determination. Section 204.00 applies to individuals who have a "[m]aximum sustained work capability limited to heavy work." 20 C.F.R. pt. 404, Subpt. P, app. 2, § 204.00. The ALJ's use of this section conflicts with his determination that plaintiff was unable to perform his past relevant work as a janitor because that work was
(continued...)

C.   Analysis of the
     ALJ's Decision

Plaintiff contends that the ALJ's decision is incorrect
for four reasons:  (1) the ALJ's finding that plaintiff did not
meet the Paragraph C Criteria was conclusory; (2) the ALJ's
credibility assessment was "unfair"; (3) the ALJ evaluated
medical sources improperly, and (4) the ALJ improperly relied on
vocational expert testimony (Plaintiff's Memorandum of Law, dated
April 25, 2014 (Docket Item 11) ("Pl.'s Mem.") at 1, 3, 6, 11).

1.   Paragraph C Criteria

Plaintiff first argues that remand is required because
the ALJ simply concluded that plaintiff did not meet the Para-
graph C Criteria of Listing 12.04 without any assessment of the
pertinent criteria (Pl.'s Mem. at 1).  Specifically, plaintiff
claims that the ALJ failed to make the determination required at
the third criterion of Paragraph C -- whether plaintiff was able
to function outside of a highly supportive environment (Pl.'s
Mem. at 1-2).

---

[12](...continued)
too physically and mentally demanding (see Tr. 21).  His use of a
Grid Rule also conflicts with his apparent reliance on vocational
expert testimony (see Tr. 22).

The Paragraph C Criteria of Section 12.04 dictate a finding that a plaintiff is disabled if he can show:

> C.   Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
>
> 1. Repeated episodes of decompensation, each of extended duration; or
>
> 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
>
> 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. pt. 404, subpt. P, app. 1, § 12.04.

The ALJ's of the Paragraph C Criteria was limited to a statement that:  "In this case, the evidence fails to establish the presence of the 'paragraph C' criteria because there is no evidence that claimant experiences repeated episodes of decompensation, a residual disease process barring an increase in mental demands or an inability to function outside a highly supportive living environment" (Tr. 19).

"Even where the hearing officer's ultimate conclusion is potentially supportable, the Court ought not affirm a decision where there is a reasonable basis for doubting whether the

28

appropriate legal standards were applied." Aregano v. Astrue, 882 F. Supp. 2d 306, 320 (N.D.N.Y. 2012), citing Johnson v. Bowen, supra, 817 F.2d at 986 and Berry v. Schweiker, 675 F.2d 464, 469 (2d Cir. 1982) (In "cases in which the disability claim is premised upon one or more listed impairments of Appendix 1, the Secretary should set forth a sufficient rationale in support of his decision to find or not to find a listed impairment.").

The ALJ made no assessment with respect to the third Paragraph C criterion, i.e., whether plaintiff had a current history of one or more years' inability to function outside a highly supportive living arrangement and indicated a continued need for such an arrangement.  He simply stated that the criterion was not met.  The facts here are not so clear as to render the ALJ's analysis of this third criterion unnecessary.  On the one hand, plaintiff had successfully graduated from Mental Health Court, was actively looking for new housing, and the ALJ identified activities that plaintiff was capable of doing on his own; however, given plaintiff's thirty months in a court-mandated residential mental health treatment facility, his report and his mother's report regarding the support provided in that facility and the physicians' recommendations of continued intensive

psychological treatment, the ALJ should have provided some analysis as to the third Paragraph C criterion.[13]

This failure warrants remand for further explanation. See Aregano v. Astrue, supra, 882 F. Supp. 2d at 320 ("The hearing officer addressed only one of [the Paragraph C] factors, and did not include any evidence or discussion of the other factors."); Bohn v. Comm'r of Soc. Sec., 7:10-CV-1078 (TJM)(DEP), 2012 WL 1048607 at *10 (N.D.N.Y. Mar. 5, 2012) (Report & Recommendation), adopted at 2012 WL 1048867 (N.D.N.Y. Mar. 28, 2012) ("[T]he ALJ offered no meaningful analysis in his decision whatsoever regarding the paragraph (C) criteria.  This was error and alone requires reversal and a remand of the matter to the agency for further consideration.").

2.  Credibility Assessment

Plaintiff also argues that remand is required because the ALJ improperly discounted plaintiff's credibility based on plaintiff's attendance at his hearing, his regular long walks and his ability to do laundry in a communal area (Pl.'s Mem. at 3-6).

_____

[13]Plaintiff claims that the consulting physicians and plaintiff's treating sources state that plaintiff requires a highly supportive environment in order to function and that the ALJ failed to acknowledge this in his Paragraph C analysis (Pl.'s Mem. at 2-3).  Neither the consulting physicians nor the treating sources made such statements.

Plaintiff argues that it was unfair to require plaintiff's attendance at the hearing and then to use his attendance to discredit his testimony, that it was improper to interpret plaintiff's long walks, which were a coping mechanism, as an indication he was capable of being in public, and that it was improper to assume that plaintiff's ability to do laundry in a communal laundry room meant he could successfully function in a public setting (Pl.'s Mem. at 4-6).

"An ALJ 'is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of other evidence in the record.'" Burnette v. Colvin, 564 F. App'x 605, 609 (2d Cir. 2014) (summary order), quoting Genier v. Astrue, supra, 606 F.3d at 49; Campbell v. Astrue, 465 F. App'x 4, 7 (2d Cir. 2012) (summary order) ("[W]e have long held that '[i]t is the function of the [Commissioner], not ourselves, . . . to appraise the credibility of witnesses, including the claimant.'" (first alteration added)), quoting Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983).

The ALJ found plaintiff to be "credible, but not to the extent alleged [sic]" (Tr. 21). I assume the ALJ was attempting to say that he found claimant not entirely credible. The ALJ discounted plaintiff's testimony regarding his anxiety induced by

31

being around people because plaintiff was able to use public
transportation by himself, went for long walks alone, did laundry
in a communal laundry room, had had romantic relationships, could
perform his own activities of daily living and left his last job
in 2006 only because it was temporary (Tr. 21).

The ALJ's analysis of these factors was not inappropri-
ate.  The ALJ was required to engage in a credibility analysis,
and that is what he did.  Contrary to plaintiff's contention, the
ALJ did not discredit plaintiff's testimony concerning the
severity of his symptoms simply because he attended the hearing;
rather, the record contains several other reports of plaintiff's
ability to use public transportation successfully.[14]  More impor-
tantly, the fact that the record might support a different
finding with respect to plaintiff's credibility, which is essen-
tially plaintiff's argument, is not grounds for remand.  McIntyre
v. Colvin, 758 F.3d 146, 149 (2d Cir. 2014) ("If evidence is
susceptible to more than one rational interpretation, the Commis-

---

[14]Plaintiff cites Hyer v. Colvin, 3:12-CV-0054 (GTS)(DEP),
2013 WL 1193444 at *2 (N.D.N.Y. Mar. 22, 2013), in support of his
contention that a claimant's attendance at his disability hearing
cannot be held against him (Pl.'s Mem. at 4).  This case is
inapposite.  The court remanded that matter because, among other
issues, the ALJ failed to assess the plaintiff's credibility,
giving only a conclusory statement.  Hyer v. Colvin, supra, 2013
WL 1193444 at *9.

sioner's conclusion must be upheld."), <u>citing</u> <u>Rutherford v.</u>
<u>Schweiker</u>, 685 F.2d 60, 62 (2d Cir. 1982).

        3.   Medical
           <u>Source Opinions</u>

      Plaintiff also argues that remand is required because
the ALJ erred in his assessment of the opinions from (a) plain-
tiff's treating nurse practitioner, (b) plaintiff's treating
physician and (c) the consulting physicians (Pl.'s Mem. at 6-9).

          a.   Treating Nurse
             <u>Practitioner</u>

      Plaintiff argues that the ALJ was bound to accord NP
Jung's opinion controlling weight under the treating physician
rule because she was a treating source and her assessment was
supported by treatment notes (Pl.'s Mem. at 9-10).

      NP Jung was a nurse practitioner, not a physician, and,
thus, is not an "acceptable medical source" whose opinion was
entitled to controlling weight under the regulations.  20 C.F.R.
§ 416.913(a); <u>see</u> <u>also</u> <u>Genier v. Astrue</u>, 298 F. App'x 105, 108
(2d Cir. 2008) (summary order) ("[N]urse practitioners and
physicians' assistants are defined as 'other sources' whose
opinions may be considered with respect to the severity of the
claimant's impairment and ability to work, but need not be

assigned controlling weight."), <u>citing</u> 20 C.F.R. § 416.913(d)(1).
Because NP Jung was properly classified as an "other source," the
ALJ was not required to give her opinion controlling weight after
applying the factors listed in 20 C.F.R. § 416.927; <u>see</u> SSR 06-
3p, 2006 WL 2329939 at *4-*5 (Aug. 9, 2006) ("Although the
factors in 20 CFR 404.1527(d) and 416.927(d) explicitly apply
only to the evaluation of medical opinions from 'acceptable
medical sources,' these same factors can be applied to opinion
evidence from 'other sources.'").[15]

        The ALJ, did not, however, apply the required factors.
Regarding NP Jung's opinion, he wrote:

> Ms. Jung's opinions regarding the claimant's mental
> functional limitations at Exhibit 3F are given little
> weight because it is [<u>sic</u>] inconsistent with claim-
> ant['s] activities of daily living detailed above and
> inconsistent with and not supported by the medical
> records as described above.  For example, the claim-
> ant's mental status examinations since 2004 have been
> essentially normal.  In addition, Ms. Jung is not a
> medically acceptable source (20 C.F.R. § 416.913(d)[)]

---

[15]The factors are:  (1) whether the source examined the
individual, (2) the length and frequency of the treatment rela-
tionship, (3) whether the source presents evidence to support an
opinion, (4) how consistent the opinion is with the other evi-
dence of record, (5) the specialization of the source and (6) any
other relevant factors.  20 C.F.R. § 416.927(c).  Effective March
26, 2012, Section 416.927(d) was re-codified as 416.927(c), but
with no substantive changes.  <u>See</u> How We Collect & Consider
Evidence of Disability, 77 Fed. Reg. 10,651, 10,657 (Feb. 23,
2012) (codified at 20 C.F.R. pts. 404, 416).

(Tr. 21).  The ALJ also noted that "Ms. Jung wrote on June 6, 2011 that the claimant had a history of suicide attempts and one homicide attempt, but save for a depressed mood, his mental status examination was normal (Exhibit 3F)" (Tr. 20).[16]

      The only factor the ALJ addressed here was the consistency of NP Jung's opinion with the rest of the record; however, that analysis is internally inconsistent.  The ALJ stated that NP Jung found plaintiff to have a normal mental status, but he then discounted NP Jung's opinion because he found it to be inconsistent with other evidence of record that showed plaintiff's mental status to be essentially normal since 2004.[17]  The ALJ also claimed that Jung's opinion is inconsistent with plaintiff's ability to perform the activities of daily living; however, it is not apparent from Jung's report how that is so.  In fact, Jung concluded that plaintiff had no limitations on his ability to perform the activities of daily living.  Furthermore, the ALJ inappropriately discounted Jung's opinion on the basis of her

---

[16]NP Jung's report at Exhibit 3F is undated (see Tr. 254).

[17]While the ALJ characterizes plaintiff's mental status as "normal," Dr. Rosendahl, plaintiff's treating physician, recommended in March 2012 that plaintiff remain in close psychiatric observation and treatment to target depression, mood lability, impulsivity and rage episodes (Tr. 326), and Dr. Hoffman, the consulting psychologist, also recommended, in June 2011, that plaintiff continue to receive "intensive outpatient mental health treatment" (Tr. 261).

status as an "other source."  Losquadro v. Astrue, 11 Civ. 1798
(JFB), 2012 WL 4342069 at *15 (E.D.N.Y. Sept. 21, 2012) ("[T]he
ALJ cannot disregard or give little weight to a medical opinion
solely because it is categorized as an 'other source.'").

        The ALJ's lack of analysis with respect to Jung's
opinion is particularly problematic here because Jung had a
lengthy treatment relationship with the plaintiff, as evidenced
by her treatment notes in the record.  See Carroll v. Colvin, 13
Civ. 456S, 2014 WL 2945797 at *3 (W.D.N.Y. June 30, 2014)
("Sources not technically deemed 'acceptable medical sources,'
. . . are important in the medical evaluation because they have
increasingly assumed a greater percentage of the treatment and
evaluation functions previously handled primarily by physicians
and psychologists."  (internal quotation marks omitted)).  Remand
is, therefore, also appropriate so the ALJ can provide an appro-
priate analysis of Jung's opinion.


            b.   Treating Physician


        Plaintiff next argues that the ALJ erred by failing to
provide good reasons for rejecting Dr. Rosendahl's opinion and
failing to state what weight he accorded Dr. Rosendahl's opinion
(Pl.'s Mem. at 8-9).  There are only treatment notes from Dr.
Rosendahl in the record -- there is no opinion as to plaintiff's

ability to work and consequently no discussion of it in the
record.  Because there is no opinion from Dr. Rosendahl in the
record, plaintiff's argument lacks a factual predicate and must
be rejected.

          c.   <u>Consulting Physicians</u>

         Plaintiff argues that the ALJ violated the treating
physician rule by affording the consultative opinions greater
weight than plaintiff's treating sources (Pl.'s Mem. at 10).

         It is not per se legal error for an ALJ to give greater
weight to a consulting opinion than a treating opinion.  <u>See</u>
<u>Rosier v. Colvin</u>, No. 13-4490-CV, 2014 WL 5032325 at *2 (2d Cir.
Oct. 9, 2014) (summary order), <u>citing</u> <u>Halloran v. Barnhart</u>, 362
F.3d 28, 32 (2d Cir. 2004) ("Although the treating physician rule
generally requires deference to the medical opinion of a claim-
ant's treating physician, the opinion of the treating physician
is not afforded controlling weight where . . . [it is] not con-
sistent with other substantial evidence in the record . . . .").

         Nevertheless, in absence of a treating physician's
opinion, the regulations require both examining and nonexamining
consultants' opinions to be analyzed using the same factors used
to assess a treating physician's opinion.  "Regardless of its
source, [the SSA] will evaluate every medical opinion [it]

receive[s].  Unless [the SSA] give[s] a treating source's opinion
controlling weight under paragraph (c)(2) of this section, [it
will] consider all of [several specific] factors in deciding the
weight [it] give[s] to any medical opinion."  20 C.F.R. §
416.927(c); see Peryea v. Comm'r of Soc. Sec., 5:13-CV-0173
(GTS)(TWD), 2014 WL 4105296 at *8 (N.D.N.Y. Aug. 20, 2014)
(adopting Report & Recommendation) ("[Consulting] opinions must
be evaluated according to the criteria governing all medical
opinions."); Finney ex rel. B.R. v. Colvin, 13-CV-00543-A, 2014
WL 3866452 at *7 (W.D.N.Y. Aug. 6, 2014) (Report & Recommenda-
tion) (listing the "six factors used in evaluating [opinions of]
consultative psychologists"), citing 20 C.F.R. § 416.927(d).
This the ALJ did not do.

    Here, there was no opinion at all from plaintiff's
treating physician, and the ALJ gave "little weight" to plain-
tiff's only treating source, NP Jung.  When analyzing the con-
sulting physician opinions, from Dr. Harding and Dr. Hoffman, the
ALJ wrote:  "I give great weight to the opinions set forth by the
psychological consultative examiner, and the physician opinions
in the Psychiatric Review Technique and Mental [R]esidual [F]unc-
tional [C]apacity [A]ssessment since those assessments [conclude]
that the claimant can perform unskilled work [sic], despite an
array of moderate mental limitations" (Tr. 21).  The foregoing

sentence essentially says, "I credit the psychological consulting physician and certain other physician opinions because they conclude plaintiff is not disabled."  This reasoning is patently deficient and requires remand for compliance with the analysis required by the regulations.

> d.   Consulting Physician
> Opinion as Evidence

Plaintiff also challenges the ALJ's use of the opinion from the nonexamining consulting physician, Dr. Harding, as evidence.  Specifically, plaintiff argues that, "Since T. Harding is the state agency reviewer, he/she is summarizing evidence in the decision-making process.  This is not evidence, but rather, a part of the decision-making process itself" (Plaintiff's Reply Memorandum of Law, dated July 11, 2014 (Docket Item 16) at 1-2).  The regulations specifically state that "administrative law judges must consider findings and other opinions of State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists as opinion evidence."  20 C.F.R. § 416.927(e)(2)(i).  Consequently, plaintiff's argument in this regard fails.

4.   Reliance on Vocational
     Expert Testimony

Lastly, plaintiff argues that the ALJ erred by relying on the vocational expert's testimony (Pl.'s Mem. at 11-12).

The ALJ posed two questions to the vocational expert.[18] In each question, the ALJ described hypothetical restrictions and asked the vocational expert whether there was work in the national economy that an individual with those restrictions could perform.  The vocational expert testified that work existed for an individual with the first set of restrictions described by the ALJ, but that work did not exist for an individual with the second set of restrictions.  In his decision, the ALJ relied on the vocational expert's response to the first question in determining that the plaintiff was not disabled, but he did not mention the second question.

Plaintiff argues that the ALJ's reliance on the vocational expert's testimony was improper because the plaintiff's limitations were not adequately described by the hypothetical in the ALJ's first question, and the ALJ was required to explain why he did not rely on the vocational expert's testimony in response to the ALJ's second question (Pl.'s Mem. at 11-12).

_____

[18]The questions to the vocational expert are summarized at pages 15-16 above.

"An ALJ may rely on a vocational expert's testimony regarding a hypothetical as long as the facts of the hypothetical are based on substantial evidence and accurately reflect the limitations and capabilities of the claimant involved." Calabrese v. Astrue, 358 F. App'x 274, 276 (2d Cir. 2009) (summary order) (citations omitted), citing Dumas v. Schweiker, 712 F.2d 1545, 1553-54 (2d Cir. 1983) and Aubeuf v. Schweiker, 649 F.2d 107, 114 (2d Cir. 1981).

Here, the ALJ's RFC determination was identical to the first hypothetical posed to the vocational expert[19]; consequently, if that RFC was supported by substantial evidence, it was proper for the ALJ to rely on the vocational expert's testimony. However, because the ALJ must reassess the medical sources and reassess plaintiff's RFC, the ALJ may need to obtain further testimony from a vocational expert in the event that his new finding of RFC differs from the previous one.

IV.  Conclusion

Accordingly, for all the foregoing reasons, I respectfully recommend that the Commissioner's motion for judgment on the pleadings be denied and plaintiff's cross-motion for judgment

---

[19]Plaintiff argues that the ALJ never made an RFC determination (Pl.'s Mem. at 11).  That is not true (see Tr. 19).

on the pleadings be granted to the extent of remand.  I recommend
that the case be remanded to the Commissioner pursuant to sen-
tence four of 42 U.S.C. § 405(g) for further proceedings consis-
tent with this report and recommendation.

V.  Objections

        Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of
the Federal Rules of Civil Procedure, the parties shall have
fourteen (14) days from receipt of this Report to file written
objections.  See also Fed.R.Civ.P. 6(a).  Such objections (and
responses thereto) shall be filed with the Clerk of the Court,
with courtesy copies delivered to the Chambers of the Honorable
Paul G. Gardephe, United States District Judge, 40 Foley Square,
Room 2204, and to the Chambers of the undersigned, 500 Pearl
Street, Room 750, New York, New York 10007.  Any requests for an
extension of time for filing objections must be directed to Judge
Gardephe.  FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS **WILL**
RESULT IN A WAIVER OF OBJECTIONS AND **WILL** PRECLUDE APPELLATE
REVIEW.  Thomas v. Arn, 474 U.S. 140, 155 (1985); United States
v. Male Juvenile, 121 F.3d 34, 38 (2d Cir. 1997); IUE AFL-CIO
Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993); Frank
v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992); Wesolek v. Canadair

Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988); McCarthy v. Manson, 714

F.2d 234, 237-38 (2d Cir. 1983) (per curiam).

Dated:   New York, New York
         December 17, 2014

                           Respectfully submitted,


                           _____
                           HENRY PITMAN
                           United States Magistrate Judge

Copies transmitted to:

Daniel Berger, Esq.
NY Disability, LLC
1000 Grand Concourse, Suite 1-A
Bronx, New York 10451

Joseph A. Pantoja, Esq.
United States Attorney's Office
Southern District of New York
86 Chambers Street
New York, New York 10007

43